## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| Daywaren Stewart and<br>Kenya Stewart, | ) ) ) | Civil Action File No.: |
| Plaintiffs, | ) ) | |
| v. | ) ) | **COMPLAINT** |
| Experian Information Solutions, Inc.<br>and Santander Consumer USA Inc. | ) ) ) | **WITH JURY TRIAL DEMAND** |
| Defendants. | ) ) ) | |

## PRELIMINARY STATEMENT

1.     The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system. Congress enacted the Fair Credit Reporting Act, 15 U.S. Code § 1681, *et seq*. (the "FCRA") to ensure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy.

1

2.     Under the FCRA, consumer reporting agencies are charged with two primary duties: the duty to follow reasonable procedures to assure maximum possible accuracy of information when preparing consumer reports; and the duty to reasonably reinvestigate consumers' disputes of inaccurate information, and then appropriately correct or modify the disputed information. A consumer reporting agency's duty to reasonably reinvestigate consumers' disputes of inaccurate information explicitly includes the duty to notify the furnisher of the disputed information. This is because the furnisher of the disputed information stands in a better position to make a thorough investigation of the disputed information than the credit reporting agency.

3.     Under the FCRA, furnishers of information have two similar primary duties: to report complete and accurate information regarding the consumers about whom the furnishers report; and, upon receiving notice of a consumer's dispute from a consumer reporting agency, to conduct an investigation of the disputed information, and then modify, delete, or permanently block the reporting of that information as appropriate.

4.     Defendants compile, maintain, and report information concerning Plaintiffs' credit-worthiness, credit-standing, credit capacity, character, and general

reputation. That information is then made available for use by third-parties in credit transactions involving Plaintiffs, for employment purposes, the underwriting of insurance for Plaintiffs, and even in connection with a determination of Plaintiffs' eligibility for a license or other governmental benefit. Accordingly, and pursuant to various provisions of the FCRA, Plaintiffs have a legally protected interest in Defendants fulfilling their respective duties under the FCRA, so that the information reported and maintained by Defendants is done so in a manner which is fair and equitable to Plaintiffs, with regards to the confidentiality, accuracy, and relevancy of that information.

5.    This action for damages is based on Defendants' false reporting on Plaintiffs' credit files and/or consumer reports, failures to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiffs, and failures to conduct reasonable investigations and reinvestigations with respect to disputes of such information.

## **PARTIES**

6.    Plaintiff, Daywaren Stewart, is a natural person who resides in Dekalb County, Georgia.

7.   Plaintiff, Kenya Stewart, is a natural person who resides in Dekalb County, Georgia.

8.   Plaintiffs are individuals and are, therefore, a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

9.   Defendant, Experian Information Solutions, Inc. (hereinafter "Experian"), is a corporation formed under the laws of the State of Ohio and registered to do business in the State of Georgia. Experian may be served with process via its registered agent, C T Corporation System, at 289 South Culver Street, Lawrenceville, Georgia 30046.

10.   Experian regularly assembles and/or evaluates consumer credit information for the purpose of furnishing consumer reports to third parties and uses interstate commerce to prepare and/or furnish the reports. Accordingly, Experian is a "consumer reporting agency" as that term is defined by 15 U.S.C. § 1681a(f).

11.   Defendant, Santander Consumer USA Inc. (hereinafter "Santander") is a corporation formed under the laws of the State of Illinois and registered to do business in the State of Georgia. Santander may be served with process via its registered agent, C T Corporation System, at 289 South Culver Street, Lawrenceville, Georgia 30046.

4

12.    Santander regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about consumer transactions, such as Plaintiffs' transactions at issue in this lawsuit and described herein, and is, therefore, a "furnisher" as that term is used in 15 U.S.C. § 1681s-2.

## JURISDICTION AND VENUE

13.    This Court has federal question jurisdiction over Plaintiffs' Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq*., claims pursuant to 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

14.    This Court has personal jurisdiction over Defendants pursuant to O.C.G.A. § 9-10-91(1) because, *inter alia*, Defendants frequently and routinely conduct business in the State of Georgia, including the conduct complained of herein.

15.    Pursuant to 28 U.S.C. § 1391, venue is proper in the Northern District of Georgia because a substantial part of the events or omissions giving rise to the claims occurred in this district.

16.    Pursuant to LR 3.1B(3), venue is proper in the Atlanta Division because one or more Defendants maintain agents for service of process within the Atlanta Division.

## ALLEGATIONS OF FACT

### Plaintiffs' Bankruptcy Case

17.     On October 31, 2018, Plaintiffs filed a Chapter 13 Voluntary Bankruptcy Petition in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division, Case Number 18-68278-LRC (the "Bankruptcy Case").

18.     In Schedule F of their Bankruptcy Petition, Plaintiffs listed Santander as an unsecured creditor with a claim (the "Debt").

19.     On April 9, 2019, Plaintiffs filed their Chapter 13 Plan in accordance with 11 U.S.C. § 1322, reforming any pre-existing contract with Santander and setting forth their proposed treatment of the Debt owed to Santander, including detailed payment terms.

20.     Plaintiffs' Plan provided, in part, that Santander's allowed claim would be paid through the Chapter 13 Trustee and that no payments would be forthcoming from any other source.

21.     Following confirmation, Santander was bound by the terms of the Plan, including the provisions controlling payment of its claim, in accordance with 11 U.S.C. § 1327(a).

22.     A confirmed plan constitutes a new contract between the debtor and creditors, and thereafter, a creditor's rights are defined by the confirmed plan. Consequently, a pre-petition claim provided for in a confirmed plan is no longer a pre-petition claim. The claim is a right to payment arising from the confirmed plan.

23.     Santander did not object to Plaintiffs' Plan.

24.     On April 24, 2019, Plaintiffs' Plan was confirmed.

25.     Santander was served with a copy of the Order Confirming Plan on April 26, 2019, by the Bankruptcy Noticing Center.

26.     The Bankruptcy Case is currently pending and Plaintiffs continue to substantially perform under the terms of their Confirmed Plan.

### Effect of Consumer Reports Which Contain
### Inaccurate or Misleading Information

27.     Under the FCRA, the term "consumer report" generally refers to:

any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for:

   i.    credit or insurance to be used primarily for personal, family, or household purposes;

      ii.     employment purposes; or

      iii.    any other purpose authorized under section 1681b of this title.

15 U.S.C. § 1681a(d)(1).

28. The information contained in a consumer report bears on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, and personal characteristics.

29. The information contained in a consumer report can have a tremendous effect on the consumer; to name only a few, the report can impact the consumer's:

    a.    Eligibility for and terms for credit;

    b.    Potential for refinancing of existing credit;

    c.    Eligibility for leasing prospects;

    d.    Eligibility for utility services;

    e.    Eligibility for and the terms of insurance;

    f.    Employment or potential employment;

    g.    Accounts which are under collection or review;

    h.    Eligibility for a license or other benefit granted by a governmental instrumentality, particularly where the

instrumentality is required by law to consider an applicant's financial responsibility or status;

    i.    Standing with potential investors or servicers; and

    j.    Eligibility for individually-billed travel charge cards used by executive departments and agencies.

30.    The terms "consumer report", "credit report", and "consumer credit report" are used synonymously herein.

31.    Approximately two million consumer reports are issued by credit bureaus each day. See, Robert B. Avery, Paul S. Calem, and Glenn B. Canner, Federal Reserve Board, Division of Research and Statistics, and Raphael W. Bostic, University of Southern California, *An Overview of Consumer Data and Credit Reporting* (February 2003), p. 48-49, available at https://www.federalreserve.gov/pubs/bulletin/2003/0203lead.pdf, *archived at* https://perma.cc/DCY4-ZS6C (last accessed on September 3, 2018).

32.    In 2012, the Federal Trade Commission conducted a study regarding consumer credit reporting errors and determined that anywhere from 10 to 21 percent of consumers have confirmed errors on their consumer reports. Federal Trade Commission, *Report to Congress under Section 319 of the Fair and Accurate Credit*

9

*Transactions Act of 2003* (December 2012), p. iv of Executive Summary, available at https://www.ftc.gov/sites/default/files/documents/reports/section-319-fair-and-accurate-credit-transactions-act-2003-fifth-interim-federal-trade-commission/130211factareport.pdf, *archived at* https://perma.cc/R3P4-FGV9 (last accessed on September 3, 2018).

33. The FTC study found that not only do these errors adversely affect consumers' credit scores, but the estimated proportion of reports and consumers who experience a positive credit score change resulting from the *correction* of these errors is higher than previous estimates from the credit reporting industry. *Id*.

<u>*Credit Scoring*</u>

34. The Fair Isaac Corporation credit risk scoring system, commonly referred to as "FICO", is the leading credit scoring system and utilizes data reported by credit reporting agencies. See, https://www.myfico.com/credit-education/credit-scores/ (last accessed on September 3, 2018).

35. The Fair Isaac Corporation uses the data in consumer reports to calculate consumers' credit scores (also known as credit risk scores). *Id*.

36. The term "credit score" is a numerical value or a categorization derived from a statistical tool or modeling system used by a person who makes or arranges

a loan to predict the likelihood of certain credit behaviors, including default. Consumer Financial Protection Bureau, *Supervision and Examination Manual, Version 2* (October 2012), p. 53, available at http://files.consumerfinance.gov/f/201210_cfpb_supervision-and-examination-manual-v2.pdf, *archived at* http://perma.cc/JF32-RFAA, (last accessed on September 3, 2018).

37.    FICO scores are calculated from five main categories of credit data in a consumer's credit report. Those categories, and their weighted values, are as follows: payment history accounts for 35% of a consumer's FICO score; debt/amounts owed accounts for 30% of a consumer's FICO score; age/length of credit history accounts for 15% of a consumer's FICO score; new credit/recent inquiries accounts for 10% of a consumer's FICO score; and mix of accounts/types of credit accounts for 10% of a consumer's FICO score. See, https://www.myfico.com/credit-education/whats-in-your-credit-score/, *archived at* https://perma.cc/E8Y3-F4AA (last accessed September 3, 2018).

38.    The cost of credit (e.g., interest rates, fees, etc.), the availability of credit, ratings for insurance products, and even unsolicited credit offers, such as the opportunity to refinance a mortgage at a lower interest rate, extended financing

periods and lower rate auto loans, and even zero-percent financing credit offers for in-store credit lines, are all, by and large, driven by a consumer's credit score.

39.     Inaccurate or incorrect credit reporting very often results in a lower FICO and other credit scoring model scores, and thus higher costs of credit, diminished opportunity, and less purchasing power for consumers.

40.     "Written off" is an accounting term, and simply means that the credit grantor wrote the account off of their receivables as a loss, and that the account is closed to future charges. See,

https://www.experian.com/blogs/ask-experian/charged-off-debt-must-still-be-repaid/ (last accessed September 3, 2018).

41.     When an account displays a status of "written off," although the account is closed to future use, the debt is still owed. In fact, most lenders sell their charged off accounts to a collection agency for a percentage of the account's value. *Id*.

42.     Incorrectly reporting the tradeline of Plaintiffs' Debt—which is provided for by Plaintiffs' Confirmed Bankruptcy Plan—as written off, without also properly noting that the Debt is included in and subject to Plaintiffs' Bankruptcy

Case, adversely affects Plaintiffs' FICO scores, as it negatively misrepresents the Debt owed by Plaintiffs.

43.     There is no established rule or threshold for classifying the significance of a credit score change as minor or major because the impact of a change in score is dependent on the current score. That is, a twenty-five-point change in a credit score that keeps the consumer in a particular credit risk category may not have a large impact on the person's likelihood of receiving credit. However, a one-point change in credit score that moves the consumer from one risk tier to the next may have a large impact on the consumer's access to credit or the products and rates the consumer is able to secure.

44.     Consistent with FTC study, the Fair Isaac Corporation states that inaccurate or incorrect information on a consumer's credit report can hurt their score. See, https://www.myfico.com/credit-education/questions/fix-errors-on-credit-report/, *archived at* https://perma.cc/9TQN-S5WP (last accessed September 3, 2018).

*Credit-Based Insurance Scoring*

45.     Other entities that regularly review consumer reports, and use the data contained therein, are insurance companies.

46.     Insurance companies use a scoring mechanism which is similar to, but distinct from, the "credit score" used by creditors.

47.     Credit-based insurance scores, like credit scores themselves, are numerical summaries of consumers' credit histories; credit-based insurance scores are typically calculated using a multitude of information, including, but not limited to, the length and age of credit history and the use of certain types of credit. Federal Trade Commission, *Credit-Based Insurance Scores: Impacts on Consumers of Automobile Insurance* (July 2007), p. 11, available at https://www.ftc.gov/sites/default/files/documents/reports/credit-based-insurance-scores-impacts-consumers-automobile-insurance-report-congress-federal-trade/p044804facta_report_credit-based_insurance_scores.pdf, *archived at* https://perma.cc/B2VQ-452N (last accessed September 3, 2018). As cited in *Ins. Inst. V. Commissioner*, 486 Mich. 370, 785 N.W.2d 67 (2010).

48.     Credit-based insurance scores evolved from traditional credit scores, and all major automobile insurance companies use credit-based insurance scores in some capacity; insurers use these scores to assign consumers to risk pools and to determine the premiums that they pay. *Id*. at 22.

49.     A Wallethub study determined that a change in credit scores caused a consumer's automobile insurance rates to rise by an average of 67% nationwide, and an average of 84% in Georgia. *2018's States Where Credit Scores Affect Car Insurance the Most – Credit Score & Car Insurance Report*, available at https://wallethub.com/edu/car-insurance-by-credit-score-report/4343/, *archived at* https://perma.cc/CSL8-D47Y (last accessed September 3, 2018).

50.     Homeowner's insurance companies also use credit scores to decide whether to issue policies, and on what terms. A higher credit score is taken to mean that a consumer is less of a risk, which, in turn, means the consumer is more likely to be able to obtain insurance, and pay less for it.

See    https://www.consumer.ftc.gov/articles/0152-credit-scores, *archived at* https://perma.cc/EB3D-54UP (last accessed September 3, 2018).

51.     The National Association of Insurance Commissioners ("NAIC") is the U.S. standard-setting and regulatory support organization created and governed by the chief insurance regulators from the 50 states, the District of Columbia, and five U.S. territories. See, http://www.naic.org/index_about.htm (last accessed September 3, 2018).

52.     The NAIC advises consumers who find errors on their credit reports to contact the credit reporting company to have the errors corrected, as the errors can affect the consumer's credit-based insurance score. National Association of Insurance Commissioners, *Credit-Based Insurance Scores: How an Insurance Company Can Use Your Credit to Determine Your Premium*, available at http://www.naic.org/documents/consumer_alert_credit_based_insurance_scores.htm, *archived at* https://perma.cc/S4F2-9VTL (last accessed September 3, 2018).

53.     There are several different companies that create credit-based insurance score reports for insurers to use, including the Fair Isaac Corporation. In calculating credit-based insurance scores, FICO looks at five general areas it believes will best determine how an individual manage risks. *Id*.

54.     The following is a breakdown of what FICO considers in calculating credit-based insurance scores, and how much the information generally weighs in that calculation: payment history accounts for 40% of a consumer's of a consumer's FICO credit-based insurance score; debt/amounts owed accounts for 30% of a consumer's of a consumer's FICO credit-based insurance score; age/length of credit history accounts for 15% of a consumer's FICO credit-based insurance score; new credit/recent inquiries accounts for 10% of a consumer's of a consumer's FICO

16

credit-based insurance score; and, mix of accounts/types of credit accounts for 5% of a consumer's of a consumer's FICO credit-based insurance score. *Id*.

55.     Incorrectly reporting the tradeline of Plaintiffs' Debt—which is provided for by Plaintiffs' Confirmed Bankruptcy Plan—as written off, without also properly noting that the Debt is included in and subject to Plaintiffs' Bankruptcy Case, adversely affects Plaintiffs' FICO credit-based insurance scores, as it negatively misrepresents the debt/amounts owed by Plaintiffs.

## The CDIA Metro 2 Credit Reporting Standards

### *The CDIA has Imposed Rigorous Industry Standards to Ensure FCRA Compliance*

56.     The reporting of consumer credit information, by credit reporting agencies ("CRAs") and data furnishers, is the foundation of credit risk scoring and impacts the financial lives of consumers in innumerable ways, including the availability and cost of credit, housing opportunities, leasing prospects, insurance availability and cost, utility service, and even employment. Between two and three million consumer reports are issued by credit bureaus each day. See, http://www.cdiaonline.org/about.cfm (last accessed September 3, 2018).

57.     The Consumer Data Industry Association ("CDIA") is an international trade association, representing over 140 members involved in credit reporting,

mortgage reporting, check verification, tenant and employment screening, collection services, and fraud verification services, and the CDIA is active in both federal and state legislative affairs, public relations, education, and the promulgation of industry standards.

58.    Because consumer credit reporting information is such sensitive data that has far reaching implications for most, if not all, consumers, the CDIA works together with CRAs to develop, maintain and enhance industry-standard reporting formats and guidelines.

59.    To further assist CRAs and data furnishers with performing their due diligence and reporting accurate, complete, and timely data, in satisfaction of the FCRA's legal requirements, the CDIA offers extensive training, education, and support to CRAs and data furnishers.

60.    The CDIA's extensive training and support offerings include FCRA certification programs for both CRAs and data furnishers, to assist each in maintaining compliance with FCRA regulations.

61.    Because standardized methods are of paramount importance to the accurate, complete and timely reporting of consumer credit data, the CDIA can and will revoke FCRA certification for failure to adhere to the standards set by the CDIA.

62.     In cooperation with the major CRAs, CDIA publishes the Metro 2 ("Metro 2") reporting standards to assist furnishers with their compliance requirements under the FCRA. CDIA's reporting products are used in more than nine billion transactions each year.

See,     http://www.cdiaonline.org/about/index.cfm?unItemNumber=515     (last accessed September 3, 2018).

63.     The Metro 2 Format Task Force is comprised of representatives from Equifax, Experian, Innovis, and TransUnion, and is supported by the CDIA. Metro 2 Format Task Force's mission is to provide a standardized method for the reporting of accurate, complete and timely data, and has developed the Metro 2 standards. *Id.*

64.     In order to ensure compliance with the FCRA, and in furtherance of its mission, the Metro 2 Format Task Force has developed an industry standard (the "Metro2 standard") for reporting consumer accounts that "will ensure the integrity and consistency of the credit information being reported."

65.     In the credit reporting industry, Metro 2 is widely known as the well-established industry standard, uniformly adopted by furnishers and CRAs alike.

19

66.    As such, viewers/users of consumer reports both expect and rely on the information contained in consumer reports to be reported in compliance with the Metro 2 standards.

67.    A deviation from the Metro 2 standards results in a reported item being incomplete and/or misleading to viewers/users of consumer reports.

68.    In fact, the existence of an "industry standard" itself—one which is uniformly adopted and contractually enforced—compounds errors because it gives more credibility to false reporting.

69.    Without the existence of Metro 2, a viewer/user of consumer reports *might* presume that the furnisher or CRA simply made a mistake with respect to erroneous, negative credit reporting.

70.    However, since viewers/users of consumer reports know that Metro 2 has layers of rules and checks to ensure accuracy, they are more likely to "blame" the consumer for the false, negative credit reporting.

71.    Thus, a deviation from the Metro 2 standards results in adverse consequences for the consumer.

72.    15 U.S.C. § 1681e(b) requires consumer reporting agencies to follow reasonable procedures to assure maximum possible accuracy of information

concerning the individual about whom a report relates. Similarly, 15 U.S.C. § 1681i(a)(1) requires consumer reporting agencies to conduct reasonable reinvestigations of a consumer's dispute of the completeness or accuracy of any item of information contained in the consumer's file.

73.    15 U.S.C. § 1681s-2(a)(2) requires furnishers of information to regularly correct and update the information they previously provided to consumer reporting agencies, to make sure the information is complete and accurate. Similarly, upon receiving notice from a consumer reporting agency of a consumer's dispute, 15 U.S.C. § 1681s-2(b)(1) requires furnishers of information to conduct reasonable investigations of a consumer's dispute of the completeness or accuracy of any information provided by the furnisher of information to a consumer reporting agency.

74.    The uniform adoption and implementation of the Metro 2 standards is the primary vehicle by which CRAs and furnishers ensure that they are in compliance with their respective duties to ensure that they maintain complete and accurate information under the FCRA.

75.    The Metro 2 standards provide uniformity in the reporting and interpretation of credit data, including credit risk scoring.

76.     The Metro 2 standards are documented in the Credit Reporting Resource Guide ("CRRG"), an industry-standard publication produced and distributed by the CDIA.

77.     As an integral aspect of its duties under the FCRA, Experian is required to have in place adequate and reasonable policies and procedures to assure the maximum possible accuracy of information concerning individuals about whom Experian produces reports; the requirement to maintain reasonable procedures extends to Experian's handling and reinvestigation of disputed information.

78.     At all times relevant hereto, Experian adopted and implemented the Metro 2 format as a means of fulfilling its aforementioned duties under the FCRA.

79.     At all times relevant hereto, Experian has required all entities to whom it grants consumer information reporting rights and access to adhere to the Metro 2 reporting guidelines as a condition of such ability and access.

80.     As an integral aspect of its duties under the FCRA, Santander is required to have in place adequate and reasonable policies and procedures for handling and investigation of disputed information.

81.     At all times relevant hereto, Santander adopted and implemented the Metro 2 format as a means of fulfilling its aforementioned duties under the FCRA.

82.     Furthermore, at all times relevant hereto, Santander incorporated, warranted, and or represented to all CRAs to which it reported that it had adopted and implemented the Metro 2 format for its reporting of consumer data, and would otherwise comply with Metro 2 and CDIA guidelines in its reporting of consumer information.

### *The National CRAs and the Furnishers of Consumer Information Communicate Metro 2 Compliant Notices of Consumer Disputes and Responses, Respectively, Through the e-Oscar Reporting Platform*

83.     The FCRA requires CRAs to implement an automated reinvestigation system through which furnishers of information to the CRA may report the results of a reinvestigation that finds incomplete or inaccurate information in a consumer's file. 15 U.S.C. § 1681i(a)(5)(D).

84.     To comply with the automated dispute reinvestigation requirements of the FCRA, Trans Union, Equifax, and Experian (the three major "National CRAs"), along with Innovis Data Solutions, Inc., developed and implemented a browser-based software system that allows the CRAs to electronically notify furnishers quickly and easily of disputed credit reporting information, and for furnishers to quickly and easily respond to such disputes following the furnisher's investigation of the disputed information.

85.     The system is commonly referred to as e-OSCAR (Online Solution for Complete and Accurate Reporting) and was designed to be Metro 2 compliant. *See http://www.e-oscar.org/* (last accessed October 30, 2018).

86.     The e-OSCAR system primarily supports Automated Credit Dispute Verification ("ACDV") and Automated Universal Data Form ("AUD") processing, as well as other consumer-dispute-related processes. *Id*.

87.     The National CRAs, provide notice of a consumer's dispute to data furnishers in the ACDV format, and forward the ACDV to the furnisher through e-OSCAR.

88.     If a furnisher's investigation of a consumer's dispute determines that the information in dispute is incomplete or inaccurate, the FCRA requires the furnisher to correct the information not only with the CRA that sent the ACDV, but with all other CRAs to whom the furnisher reported that information. 15 U.S.C. § 1681s-2(b)(1)(D).

89.     The e-OSCAR system facilitates the furnisher's compliance with 15 U.S.C. § 1681s-2(b)(1)(D) by sending a "Carbon Copy" of an ACDV response "to each CRA with whom the [furnisher] has a reporting relationship" in addition to the

24

response to the initiating CRA. See *https://www.e-oscar.org/implementation/about-us* (last accessed February 19, 2019).

90.  Additionally, a furnisher can manually correct a tradeline with a CRA other than the one that initiated a dispute by sending an AUD within e-OSCAR.

91.  Experian requires data furnishers that report to Experian to register with and use e-OSCAR, and states that e-OSCAR is "in compliance with FCRA and Metro 2 standards." See, *https://www.transunion.com/data-reporting/support-teams* (last accessed October 30, 2018).

*Viewers of Credit Reports Presume Compliance with the Metro 2 Standards;*
*Departures from the Standards are, Therefore, Inherently Misleading*

92.  The CRRG and the Metro 2 guidelines have been uniformly adopted across the credit reporting industry.

93.  All entities which contribute to consumer reports have agreed to comply with the Metro 2 guidelines, which are "accepted by all consumer reporting agencies;" likewise, consumer reporting agencies require their furnishers to comply with the Metro2 guidelines as a condition of their agreements. CRRG at 2-1.

94.  Given the universal adoption of Metro 2, a creditor or other entity performing risk scoring or other functions using the data provided in a consumer

report will view the report in the light of the guidelines, presuming that the information reported is in compliance with industry standards.

95.    For example, The FICO scoring system utilizes data reported by CRAs and furnishers which are, ostensibly, in compliance with Metro 2 standards.

96.    As Metro 2 format has been adopted as the credit reporting industry standard, the failure on the part of a CRA to adhere to the accepted Metro 2 standards increases the probability of a reported item being false or materially misleading to viewers of consumer reports, as those users reasonably presume that the information in the consumer reports is being reported in compliance with Metro 2 standards, and interpret that information accordingly.

97.    Thus, failure to adhere to Metro 2 in consumer credit reporting adversely affects consumers, as it causes inconsistent, misleading, and/or incorrect interpretation of information regarding consumers.

98.    Experian has actual knowledge that entities reviewing consumer credit reports presume that Experian has complied with the Metro 2 standards.

99.    Santander has actual knowledge that entities reviewing consumer credit reports presume that Santander has complied with the Metro 2 standards.

100.   Because users of consumer credit reports presume the information in those reports complies with the Metro 2 standards, the failure on the part of a CRA and/or a furnisher to adhere to the accepted Metro 2 standards increases the probability of a reported item being false or materially misleading to users of consumer reports, and thus adversely affecting the consumer.

101.   The failure on the part of a CRA and/or a furnisher to adhere to the accepted Metro 2 standards can itself support a finding of willful violation as described by 15 U.S.C. § 1681n when that failure results in a report that is false, incomplete, and misleading.

102.   Further, the failure to adhere to the Metro 2 format, and/or the failure to follow the guidance of regulatory and industry sources, such as the CDIA, is evidence of willfulness of an FCRA violation under 15 U.S.C. § 1681n(a). *See*, *Gillespie v. Equifax Info. Servs., LLC*, No. 05C138, 2008 WL 4316950, at *8 (N.D. Ill. Sept. 15, 2008).

### *The Metro 2 Guidelines Mandate Regular Monthly Reporting of All Accounts*

103.   As part of that industry standard, the Metro 2 Format Task Force has declared, "All accounts must be reported *on a monthly basis*." [Emphasis added] CRRG at 2-2.

104.   Because consumer credit information changes monthly, failure to update that information on a monthly basis, yet still publishing reports containing the previously reported information without updates, means that the information being reported is almost certainly incomplete, inaccurate, and misleading.

*The Significance of the Consumer Information Indicator*

105.   Of particular importance in reporting under the Metro2 standards is the Consumer Information Indicator ("CII"), a single-character code which indicates an account's status in relation to a consumer's bankruptcy.

106.   Furnishers and CRAs are required to update the CII code when a petition for bankruptcy is filed, and again when the bankruptcy is discharged, dismissed, or withdrawn.

107.   The reporting of a proper CII code for a consumer's account ensures that the tradeline for that account accurately discloses that account's relationship to the bankruptcy case, and can suppress other statements about the account (i.e., "in collections", "charged off") which are inconsistent with its status with respect to the bankruptcy.

108.   While furnishers sometimes report derogatory information about an account during and after a bankruptcy, the reporting of an accurate CII code ensures

that if such derogatory information is reported, it is either withheld from viewers of the report, or placed in its proper context relative to the consumer's bankruptcy.

109.  This is especially important, as not all accounts are included in and/or dischargeable by consumer bankruptcy.

110.  The failure to report an accurate CII code for an account which was discharged in bankruptcy, or is included in an active bankruptcy, can lead to a consumer's report containing derogatory information which would otherwise not be visible to viewers of the report, and render other portions of the report misleading, since a viewer would not be aware that the account is included in bankruptcy.

111.  Similarly, where an account which *is not* discharged or dischargeable in bankruptcy is reported with an incorrect CII indicator, the consumer's report can falsely indicate that the account is subject to bankruptcy or discharge, and suppress the consumer's positive history of making payments toward the account.

112.  These false impressions become even greater in the light of the universally adopted Metro 2 standards, which require that an account within, or discharged by, a consumer bankruptcy be identified as such.

113.   Since the broadly adopted industry standard requires disclosure of a pending bankruptcy, the absence of such a disclosure inherently misleads a viewer into believing that the account is not included in bankruptcy.

*Reporting of Accounts with an Active, Confirmed*
*Chapter 13 Bankruptcy, under Metro 2*

114.   Upon confirmation of a Chapter 13 plan, Metro 2 requires furnishers and CRAs to report an account included in the debtor's bankruptcy as follows:

a.   A **Consumer Information Indicator** ("CII") of "D" (or blank to maintain a "D" which was previously reported), indicating that the account is subject to a petition for Chapter 13 bankruptcy;

b.   An **Account Status Code** reflecting the status at time of the petition;

c.   A **Payment History** of "D" (indicating "no history available") for each month since the filing of the bankruptcy, plus actual history for prior months;

d.   An **Amount Past Due** of zero;

e.   A **Current Balance** reflecting the current balance as provided for under the terms of the Chapter 13 plan, rather than the original contract;

f.    **Terms Duration & Terms Frequency** which incorporate any changes the contract terms provided for under the Chapter 13 plan;

g.    The **Scheduled Monthly Payment Amount** reflecting the scheduled payment amount under the Chapter 13 plan, rather than under the original contract; and

h.    A **Date of Account** Information of the current month's date (increasing with each month's reporting).

CRRG, FAQ 28(a)-(b), at 6-21 to 6-24.

## **Plaintiff Daywaren Stewart's Experian Consumer Report**

115.   On or about May 11, 2020, Plaintiff, Daywaren Stewart (hereinafter "Mr. Stewart"), obtained a copy of his consumer report as published by Experian.

116.   That report contained erroneous information as provided by Santander, and as published and reported by Experian.

117.   The relevant portion of the Santander tradeline appeared in the May 11, 2020, Experian report as follows:

31

| Account name | Account number | Recent balance | Date opened | Status |
|---|---|---|---|---|
| SANTANDER CONSUMER USA | 3000013395667.... | $0 as of 08/31/2017 | 09/2012 | **Closed. $9,230 written off.** |

| | Type | Credit limit or original amount | Date of status | Comment |
|---|---|---|---|---|
| PO BOX 961211<br>FORT WORTH, TX 76161<br>888 222 4227<br>**Address identification number**<br>0819787901 | Auto Loan<br>**Terms**<br>79 Months | $13,997<br>**High balance**<br>$0<br>**Monthly payment**<br>$0<br>**Recent payment amount**<br>$11,891 | 08/2017<br>**First reported**<br>09/2012<br>**Responsibility**<br>Joint with<br>KENYA ADAMS | Purchased by another lender. |

**Sold to**
CASCADE CAPITAL LLC

(Remaining portion of tradeline omitted.)

118.    Because the Debt is included in Plaintiffs' Bankruptcy Case and provided for in the Confirmed Plan, the information described above was both false and misleading in a number of key respects (the "Inaccurate Reporting"), including, *inter alia*:

> a.    The Debt's current status is reported as "Closed. $9,230 written off" rather than as "Included in Bankruptcy"; and
>
> b.    The tradeline does not disclose the fact of Plaintiffs' Bankruptcy Case or that the Debt is included in and subject to the Bankruptcy Case; and
>
> c.    The tradeline was not reported in compliance with CDIA / Metro 2 standards.

119.   The Inaccurate Reporting was in derogation of accepted industry standards for reporting the account as set forth by the CDIA and Metro 2 and as adopted by Defendants, including, *inter alia*:

    a.   The tradeline does not disclose the fact of Plaintiffs' Bankruptcy Case, or the fact that the Debt is included in and subject to the Bankruptcy Case, and instead lists a status of "Closed. $9,230 written off", which indicates that the furnisher did not report a CII of "D" as required by Metro 2; and

120.   In a letter dated June 23, 2020, Mr. Stewart disputed the inaccurate and misleading information directly to Experian and advised Experian that the Santander tradeline was included in his Bankruptcy Case. The relevant portion of Plaintiff's dispute is reproduced below:

> My account with Santander Consumer USA, P.O. Box 961211, Fort Worth, Texas 76161, account number 3000013395667XXXX, is included in my active bankruptcy case filed on October 31, 2018, case number 18-68278. I am including the notice documents from the court for your review. The "status" for the account should be corrected to reflect its inclusion in that case. Please contact the furnisher to verify this information and correct this entry.

121.   The dispute letter provided Defendants with sufficient information to identify and correct the inaccurate reporting.

122.   In support of Mr. Stewart's dispute, and to assist Defendants' respective investigations, Mr. Stewart included with his dispute a copy of the Meeting of Creditors filed in his Bankruptcy Case.

123.   Pursuant to 15 U.S.C. § 1681i, Experian had a duty to notify Santander of Mr. Stewart's dispute within five business days of receiving the dispute, to forward the supporting documents submitted with Mr. Stewart's dispute for Santander's review, to conduct a reasonable reinvestigation of the disputed information, and to correct the tradeline or delete it from Mr. Stewart's consumer file.

124.   Upon information and belief, Experian timely notified Santander of Mr. Stewart's dispute, via e-OSCAR or otherwise, and provided the supporting documents submitted with Plaintiff's dispute.

125.   Alternatively, Experian failed to notify Santander of Mr. Stewart's dispute, and/or failed to provide the supporting documents submitted with Mr. Stewart's dispute.

126.   Upon information and belief, Santander received timely notice of Mr. Stewart's dispute from Experian.

127.   Pursuant to 15 U.S.C. § 1681s-2(b), Santander had a duty to conduct an investigation with respect to the disputed information, and to modify or delete that information appropriately.

128.   In a document dated July 10, 2020, Experian advised Mr. Stewart that it had researched the dispute, and provided a "revised report" that reflected its findings.

129.   Experian advised Mr. Stewart that it either made changes to his credit report based upon information provided by Mr. Stewart, or it contacted the company reporting the information to Experian and provided to it "all relevant information and any documents you gave us with your dispute".

130.   The notice goes on to assure Mr. Stewart that Experian instructed the furnisher to review "all the information" Experian provided regarding the dispute, to verify the accuracy of the information, and to provide Experian with a response to Mr. Stewart's dispute.

131.   A reproduction of the relevant portion of the report describing the procedures to Mr. Stewart appears below:

35

Our reinvestigation of the dispute you recently submitted
is now complete. If we were able to make changes to your
credit report based on information you provided, we have
done so.  Otherwise, we have contacted the company
reporting the information you disputed, supplied them all
relevant information and any documents you gave us with
your dispute, and instructed them to:  review all
information we provide them about your dispute; verify the
accuracy of the information; provide us a response to your
dispute; and update their records and systems as
necessary.

If an item you disputed is not in the list of results below, it
was either not appearing in your credit file or it already
reflected the requested status at the time of our
reinvestigation.

132.    Experian provided a copy of the tradeline as reported "post-investigation" which reproduced the errors identified by Mr. Stewart in his original dispute letter.

133.    Specifically, the Santander tradeline appeared in the revised July 10, 2020 Experian report as follows:



134.    Defendants' post-investigation reporting is, independently and jointly, false and misleading.

135.   Defendants' post-investigation reporting is in derogation of the Metro 2 reporting standards, and that departure and failure to adhere to the adopted guidelines renders the reporting both false and materially misleading, as users of consumer reports assume Defendants' compliance with Metro 2 standards in reporting consumer information.

136.   Mr. Stewart is informed and believes that the revised tradeline reflects any information provided by Santander to Experian in response to Mr. Stewart's dispute.

## **Plaintiff Kenya Stewart's Experian Consumer Report**

137.   On or about May 11, 2020, Plaintiff, Kenya Stewart (herineafter "Mrs. Stewart"), obtained a copy of her consumer report as published by Experian.

138.   That report contained erroneous information as provided by Santander, and as published and reported by Experian.

139.   The relevant portion of the Santander tradeline appeared in the May 11, 2020, Experian report as follows:

| Account name<br>SANTANDER CONSUMER USA | Account number<br>3000013395667.... | Recent balance<br>$0 as of 08/31/2017 | Date opened<br>09/2012 | Status<br>**Closed. $9,230<br>written off.** |
|---|---|---|---|---|
| PO BOX 961211<br>FORT WORTH, TX 76161<br>888 222 4227<br>**Address identification number**<br>0066529396 | **Type**<br>Auto Loan<br>**Terms**<br>79 Months | **Credit limit or<br>original amount**<br>$13,997<br>**High balance**<br>$0<br>**Monthly payment**<br>$0<br>**Recent payment<br>amount**<br>$11,891 | **Date of status**<br>08/2017<br>**First reported**<br>09/2012<br>**Responsibility**<br>Joint with<br>DAYWAREN<br>STEWART | Comment<br>Purchased by another lender. |
| **Sold to**<br>CASCADE CAPITAL LLC | | | | |

(Remaining portion of tradeline omitted.)

140. Because the Debt is included in Plaintiffs' Bankruptcy Case and provided for in the Confirmed Plan, the information described above was both false and misleading in a number of key respects (the "Inaccurate Reporting"), including, *inter alia*:

　　　　a.　　The Debt's current status is reported as "Closed. $9,230 written off" rather than as "Included in Bankruptcy"; and

　　　　b.　　The tradeline does not disclose the fact of Plaintiffs' Bankruptcy Case or that the Debt is included in and subject to the Bankruptcy Case; and

　　　　c.　　The tradeline was not reported in compliance with CDIA / Metro 2 standards.

141.    The Inaccurate Reporting was in derogation of accepted industry standards for reporting the account as set forth by the CDIA and Metro 2 and as adopted by Defendants, including, *inter alia*:

      a.    The tradeline does not disclose the fact of Plaintiffs' Bankruptcy Case, or the fact that the Debt is included in and subject to the Bankruptcy Case, and instead lists a status of "Closed. $9,230 written off.", which indicates that the furnisher did not report a CII of "D" as required by Metro 2; and

142.    In a letter dated June 23, 2020, Mrs. Stewart disputed the inaccurate and misleading information directly to Experian and advised Experian that the Santander tradeline was included in her Bankruptcy Case. The relevant portion of Plaintiff's dispute is reproduced below:

My account with Santander Consumer USA, P.O. Box 961211, Fort Worth, Texas 76161, account number 3000013395667XXXX, is included in my active bankruptcy case filed on October 31, 2018, case number 18-68278. I am including the notice documents from the court for your review. The "status" for the account should be corrected to reflect its inclusion in that case. Please contact the furnisher to verify this information and correct this entry.

143.    The dispute letter provided Defendants with sufficient information to identify and correct the inaccurate reporting.

39

144.   In support of Mrs. Stewart's dispute, and to assist Defendants' respective investigations, Mrs. Stewart included with her dispute a copy of the Meeting of Creditors filed in her Bankruptcy Case.

145.   Pursuant to 15 U.S.C. § 1681i, Experian had a duty to notify Santander of Mrs. Stewart's dispute within five business days of receiving the dispute, to forward the supporting documents submitted with Mrs. Stewart's dispute for Santander's review, to conduct a reasonable reinvestigation of the disputed information, and to correct the tradeline or delete it from Mrs. Stewart's consumer file.

146.   Upon information and belief, Experian timely notified Santander of Mrs. Stewart's dispute, via e-OSCAR or otherwise, and provided the supporting documents submitted with Mrs. Stewart's dispute.

147.   Alternatively, Experian failed to notify Santander of Mrs. Stewart's dispute, and/or failed to provide the supporting documents submitted with Mrs. Stewart's dispute.

148.   Upon information and belief, Santander received timely notice of Mrs. Stewart's dispute from Experian.

149.   Pursuant to 15 U.S.C. § 1681s-2(b), Santander had a duty to conduct an investigation with respect to the disputed information, and to modify or delete that information appropriately.

150.   In a document dated July 8, 2020, Experian advised Mrs. Stewart that it had researched the dispute, and provided a "revised report" that reflected its findings.

151.   Experian advised Mrs. Stewart that it either made changes to her credit report based upon information provided by Mrs. Stewart, or it contacted the company reporting the information to Experian and provided to it "all relevant information and any documents you gave us with your dispute".

152.   The notice goes on to assure Mrs. Stewart that Experian instructed the furnisher to review "all the information" Experian provided regarding the dispute, to verify the accuracy of the information, and to provide Experian with a response to Mrs. Stewart's dispute.

153.   A reproduction of the relevant portion of the report describing the procedures to Mrs. Stewart appears below:

Our reinvestigation of the dispute you recently submitted
is now complete. If we were able to make changes to your
credit report based on information you provided, we have
done so.  Otherwise, we have contacted the company
reporting the information you disputed, supplied them all
relevant information and any documents you gave us with
your dispute, and instructed them to:  review all
information we provide them about your dispute; verify the
accuracy of the information; provide us a response to your
dispute; and update their records and systems as
necessary.

If an item you disputed is not in the list of results below, it
was either not appearing in your credit file or it already
reflected the requested status at the time of our
reinvestigation.

154.    Experian  provided  a  copy  of  the  tradeline  as  reported  "post-
investigation" which reproduced the errors identified by Mrs. Stewart in her original
dispute letter.

155.    Specifically, the  Santander  tradeline  appeared  in  the  revised  July 8,
2020 Experian report as follows:



156.    Defendants' post-investigation reporting is, independently and jointly,
false and misleading.

157.    Defendants' post-investigation reporting is in derogation of the Metro 2 reporting standards, and that departure and failure to adhere to the adopted guidelines renders the reporting both false and materially misleading, as users of consumer reports assume Defendants' compliance with Metro 2 standards in reporting consumer information.

158.    Mrs. Stewart is informed and believes that the revised tradeline reflects any information provided by Santander to Experian in response to Mrs. Stewart's dispute.

## INJURIES-IN-FACT

159.    Defendants' actions and omissions have caused Plaintiffs to lose time attempting to correct the false information on Plaintiffs' consumer reports.

160.    The time spent by a person attempting to correct a false credit report constitutes a concrete injury for purposes of an FCRA claim. *Pinson v. JPMorgan Chase Bank, Nat'l Ass'n*, No. 16-17107, 2019 U.S. App. LEXIS 33662, at *5 (11th Cir. Nov. 12, 2019), citing Pedro v. Equifax, Inc., 868 F.3d 1275, 1280 (11th Cir. 2017).

161.    Defendants' actions and omissions have resulted in the illegitimate suppression of Plaintiffs' FICO credit scores and other credit rating model scores.

162.   The adverse effect on Plaintiffs' credit scores places Plaintiffs at the material risk of being denied credit or receiving less favorable credit terms than they otherwise would.

163.   Further, the Courts have regularly held that allegations of lower credit scores, taken as true, are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III. *Pedro v. Equifax, Inc*., 868 F.3d 1275 (11th Cir. 2017) ("[H]er credit score dropped 100 points as a result of the challenged conduct. Because Pedro alleged that she suffered an injury in fact, she has standing to pursue her complaint."); *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583 (7th Cir. 2016) (standing where Plaintiffs alleged that they "have suffered damage to their credit and been forced to pay Ocwen greater payments and a higher interest rate"); *Santangelo v. Comcast Corp*., 162 F. Supp. 3d 691 (N.D. Ill. 2016) ("a depleted credit score is sufficient to constitute an injury-in-fact for the purposes of establishing Article III standing"); *Binns v. Ocwen Loan Servicing, LLC*, No. 14-01764, 2015 U.S. Dist. LEXIS 132743, 2015 WL 5785693, at *9 (S.D. Ind. Sept. 30, 2015) ("injuries to plaintiffs' credit scores and reputations were considered intangible harms"); *Rothman v. U.S. Bank Nat'l Ass'n,* No. 13-03381, 2014 U.S. Dist. LEXIS 141100, 2014 WL 4966907, at *5 (N.D. Cal. Oct. 3, 2014) ("Injury to

a credit score is sufficient to constitute 'actual damages'"); *Green v. RentGrow, Inc.*, No. 2:16cv421, 2016 U.S. Dist. LEXIS 166229 ("A decrease in credit score may still establish an injury in fact sufficient to confer standing"); *Adams v. Fifth Third Bank*, No. 3:16-CV-00218-TBR, 2017 U.S. Dist. LEXIS 18932 (W.D. Ky. Feb. 9, 2017) ("Plaintiffs' allegations of lower credit scores … are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III."); and, *Coulbertson v. Experian Info. Sols., Inc.*, No. 16-cv-05672-RS, 2017 U.S. Dist. LEXIS 69484 (N.D. Cal. Mar. 24, 2017) ("At a minimum, Coulbertson has alleged a sufficient injury-in-fact through her claim that her credit score suffered as a result of the credit report she disputes").

164.   Defendants' actions and omissions have resulted in the illegitimate suppression of Plaintiffs' credit-based insurance scores.

165.   The adverse effect on Plaintiffs' credit-based insurance scores places Plaintiffs at the material risk of being denied insurance or receiving less favorable insurance rates and terms than they otherwise would.

166.   Defendants' actions and omissions have falsely suggested to any viewer of Plaintiffs' Experian credit report that the Debt was closed with $9,230 written off, rather than being provided for in Plaintiffs' active Bankruptcy Case.

167.   This false impression creates a material risk that Plaintiffs would be denied credit, receive less favorable credit treatment than Plaintiffs otherwise would, or receive other unfavorable treatment than Plaintiffs otherwise would, from any viewer of Plaintiffs' Experian credit report engaged in judgment-based lending.

168.   Plaintiffs' pending Bankruptcy Case does not preclude Plaintiffs from obtaining credit. On the contrary, it is not uncommon for consumers in an active Chapter 13 Bankruptcy Case to access the credit markets for the replacement or acquisition of vehicles and the refinancing of debt.[1]

## DAMAGES

### Actual Damages

169.   As a result of Defendants' actions and omissions, Plaintiffs have suffered actual damages.

170.   These damages include out-of-pocket expenses incurred as a result of Defendants' wrongful representations regarding the Debt, and Defendants' failures to abide by their obligations under the FCRA.

---

[1] The Federal Rules of Bankruptcy Procedure specifically provide for the method by which consumers in an active bankruptcy obtain approval for obtaining credit. FRBP 4001(c).

171.   Plaintiffs have suffered a decrease in Plaintiffs' credit scores as a result of Defendants' wrongful representations regarding the Debt, and Defendants' failures to abide by their obligations under the FCRA.

172.   Plaintiffs have also experienced aggravation, frustration, and stress due to the fact that Defendants are thwarting Plaintiffs from receiving the Fresh Start guaranteed by bankruptcy process and discharge.

## Statutory and Punitive Damages

173.   At the time Defendants reported the information at issue in this matter, each Defendant had actual notice that the information it was reporting regarding Plaintiffs and the Debt was false, deceptive, and misleading.

174.   For example, Plaintiffs included corroborating documents with their disputes, including the Meeting of Creditors filed in their Bankruptcy Case, which was more than sufficient to establish that the disputed information was being reported inaccurately.

175.   Additionally, the fact of Plaintiffs' Bankruptcy Case, and the Debt's inclusion in it, is a matter of public record and can easily be independently verified.

176.   Furthermore, Santander was independently notified of the fact of Plaintiffs' Bankruptcy Case by the Bankruptcy Noticing Center on several

occasions, and still failed to correct Plaintiffs' consumer reports to reflect the reporting of the Debt relative to the Bankruptcy Case.

177. Finally, Plaintiffs are informed and believe that Santander has previously provided Experian with information containing these same (or substantially similar) errors on a multitude of occasions, thus placing Experian on notice of Santander's unreliability, and deficiencies in Santander's systems and procedures, which have repeatedly caused these errors to propagate in data provided by Santander and elude correction upon dispute by consumers.

178. Each Defendant had more than enough information to correct its false, deceptive, and misleading reporting.

179. Despite that, Defendants continued to report the false, deceptive, and misleading information regarding Plaintiffs and the Debt.

180. Each Defendant failed to correct its false, deceptive, and misleading reporting, and in fact continued to report false, deceptive, and misleading information regarding Plaintiffs, as described herein.

181. Accordingly, Defendants' conduct was willful.

182. As a result of Defendants' willful actions and omissions, Plaintiffs are eligible to recover actual damages or statutory damages of up to $1,000, potential

punitive damages, costs of this action, and reasonable attorney's fees pursuant to 15 U.S.C. §§ 1681n and/or 1681o.

## CAUSES OF ACTION

### COUNT I

### VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. §§ 1681e(b) and 1681i
### Experian Information Solutions, Inc.

183.   Plaintiff, Daywaren Stewart, incorporates by reference the preceding paragraphs as though fully stated herein.

184.   Pursuant to 15 U.S.C. § 1681e(b), Experian is responsible for following reasonable procedures to assure maximum possible accuracy of information whenever it prepares consumer reports about Mr. Stewart.

185.   Pursuant to 15 U.S.C. § 1681i(a)(1)(A), Experian had an affirmative duty to independently investigate the dispute submitted by Mr. Stewart.

186.   Pursuant to 15 U.S.C. § 1681i(a)(2), Experian was required to communicate the specifics of Mr. Stewart's dispute to Santander, including the forwarding of any documents provided by Mr. Stewart in support of that dispute.

187.   A consumer reporting agency's reasonable reinvestigation must be a good faith effort to ascertain the truth; a reasonable reinvestigation must answer the

49

substance of the consumer's dispute, and may not merely be a *pro forma* record review that simply begs the question.

188.   A reasonable reinvestigation clearly requires some degree of careful inquiry, and more than just a superficial inquiry.

189.   The reasonableness of a reinvestigation under the FCRA is generally a question of fact for the jury.

190.   In order to conduct a reasonable reinvestigation, and pursuant to 15 U.S.C. § 1681i(a)(4), Experian was required to review and consider all relevant information submitted by Mr. Stewart.

191.   Mr. Stewart's dispute was clear and unambiguous as to the inaccuracies of Experian's reporting of the Debt.

192.   Mr. Stewart provided all the relevant information necessary for Experian to conduct a reasonable reinvestigation, and correct the inaccuracies in its reporting.

193.   Experian breached its duties as described herein.

194.   If Experian had conducted a reasonable reinvestigation of Mr. Stewart's dispute, Experian would have reviewed and considered all of the information Mr.

Stewart submitted in his dispute, and would have easily detected that what was being reported regarding the Debt was factually incorrect, inaccurate, and misleading.

195.    If Experian had conducted a reasonable reinvestigation of Mr. Stewart's dispute, the Santander tradeline on Mr. Stewart's Experian consumer report would have been appropriately corrected.

196.    Due to Experian's failures to follow reasonable procedures to assure maximum possible accuracy of information, and failures to conduct a reasonable reinvestigation of Mr. Stewart's dispute, the false and misleading information in Mr. Stewart's credit file and on his Experian report was not appropriately modified.

197.    Experian had all the information necessary to correct its reporting. Despite that, Experian failed to correct the false, disputed information, in the face of clear evidence that its reporting was false and misleading. That failure indicates that Experian's reinvestigation procedures were not reasonable.

198.    The fact that Experian had all the information necessary to correct its reporting, yet failed to do so in an appropriate manner, further indicates that Experian recklessly disregarded Mr. Stewart's dispute and the requirements of the FCRA, amounting to a willful violation of the statute.

199.   Upon information and belief, Experian has prepared consumer reports containing the incomplete and inaccurate information at issue, and has published the incomplete and inaccurate information to third parties.

200.   Experian willfully, or in the alternative negligently, violated 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure the maximum possible accuracy of information concerning Mr. Stewart in his consumer reports, in reckless disregard of the statutory requirements, Mr. Stewart's dispute, and the publicly recorded Bankruptcy Case filings.

201.   Experian willfully, or in the alternative negligently, violated 15 U.S.C. § 1681i in multiple ways, including without limitation, by failing to properly notify Santander of Mr. Stewart's dispute, by failing to provide Santander with all the supporting information/documents included with Mr. Stewart's dispute, by failing to conduct a reasonable reinvestigation of Mr. Stewart's dispute, and by failing thereafter to appropriately modify information in Mr. Stewart's file and on his consumer reports, in reckless disregard of the statutory requirements, Mr. Stewart's dispute, and the publicly recorded Bankruptcy Case filings.

202.   As a result of Experian's violations of 15 U.S.C. §§ 1681e(b) and 1681i, Mr. Stewart has suffered actual damages as described herein. Mr. Stewart is,

therefore, entitled to recover actual damages from Experian pursuant to 15 U.S.C. §§ 1681n and 1681o.

203.   Experian's actions and omissions were willful, rendering Experian liable to Mr. Stewart for punitive damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

204.   Mr. Stewart is entitled to recover costs and attorneys' fees from Experian pursuant to 15 U.S.C. §§ 1681n and 1681o.

<u>**COUNT II**</u>

**VIOLATIONS OF THE FAIR CREDIT REPORTING ACT**
<u>**15 U.S.C. §§ 1681e(b) and 1681i**</u>
<u>**Experian Information Solutions, Inc.**</u>

205.   Plaintiff, Kenya Stewart, incorporates by reference paragraphs 1 through 182 as though fully stated herein.

206.   Pursuant to 15 U.S.C. § 1681e(b), Experian is responsible for following reasonable procedures to assure maximum possible accuracy of information whenever it prepares consumer reports about Mrs. Stewart.

207.   Pursuant to 15 U.S.C. § 1681i(a)(1)(A), Experian had an affirmative duty to independently investigate the dispute submitted by Mrs. Stewart.

208.   Pursuant to 15 U.S.C. § 1681i(a)(2), Experian was required to communicate the specifics of Mrs. Stewart's dispute to Santander, including the forwarding of any documents provided by Mrs. Stewart in support of that dispute.

209.   A consumer reporting agency's reasonable reinvestigation must be a good faith effort to ascertain the truth; a reasonable reinvestigation must answer the substance of the consumer's dispute, and may not merely be a *pro forma* record review that simply begs the question.

210.   A reasonable reinvestigation clearly requires some degree of careful inquiry, and more than just a superficial inquiry.

211.   The reasonableness of a reinvestigation under the FCRA is generally a question of fact for the jury.

212.   In order to conduct a reasonable reinvestigation, and pursuant to 15 U.S.C. § 1681i(a)(4), Experian was required to review and consider all relevant information submitted by Mrs. Stewart.

213.  Mrs. Stewart's dispute was clear and unambiguous as to the inaccuracies of Experian's reporting of the Debt.

214.   Mrs. Stewart provided all the relevant information necessary for Experian to conduct a reasonable reinvestigation, and correct the inaccuracies in its reporting.

215.   Experian breached its duties as described herein.

216.   If Experian had conducted a reasonable reinvestigation of Mrs. Stewart's dispute, Experian would have reviewed and considered all of the information Mrs. Stewart submitted in her dispute, and would have easily detected that what was being reported regarding the Debt was factually incorrect, inaccurate, and misleading.

217.   If Experian had conducted a reasonable reinvestigation of Mrs. Stewart's dispute, the Santander tradeline on Mrs. Stewart's Experian consumer report would have been appropriately corrected.

218.   Due to Experian's failures to follow reasonable procedures to assure maximum possible accuracy of information, and failures to conduct a reasonable reinvestigation of Mrs. Stewart's dispute, the false and misleading information in Mrs. Stewart's credit file and on her Experian report was not appropriately modified.

219.   Experian had all the information necessary to correct its reporting. Despite that, Experian failed to correct the false, disputed information, in the face of

clear evidence that its reporting was false and misleading. That failure indicates that Experian's reinvestigation procedures were not reasonable.

220.   The fact that Experian had all the information necessary to correct its reporting, yet failed to do so in an appropriate manner, further indicates that Experian recklessly disregarded Mrs. Stewart's dispute and the requirements of the FCRA, amounting to a willful violation of the statute.

221.   Upon information and belief, Experian has prepared consumer reports containing the incomplete and inaccurate information at issue, and has published the incomplete and inaccurate information to third parties.

222.   Experian willfully, or in the alternative negligently, violated 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure the maximum possible accuracy of information concerning Mrs. Stewart in her consumer reports, in reckless disregard of the statutory requirements, Mrs. Stewart's dispute, and the publicly recorded Bankruptcy Case filings.

223.   Experian willfully, or in the alternative negligently, violated 15 U.S.C. § 1681i in multiple ways, including without limitation, by failing to properly notify Santander of Mrs. Stewart's dispute, by failing to provide Santander with all the supporting information/documents included with Mrs. Stewart's dispute, by failing

to conduct a reasonable reinvestigation of Mrs. Stewart's dispute, and by failing thereafter to appropriately modify information in Mrs. Stewart's file and on her consumer reports, in reckless disregard of the statutory requirements, Mrs. Stewart's dispute, and the publicly recorded Bankruptcy Case filings.

224.    As a result of Experian's violations of 15 U.S.C. §§ 1681e(b) and 1681i, Mrs. Stewart has suffered actual damages as described herein. Mrs. Stewart is, therefore, entitled to recover actual damages from Experian pursuant to 15 U.S.C. §§ 1681n and 1681o.

225.    Experian's actions and omissions were willful, rendering Experian liable to Mrs. Stewart for punitive damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

226.    Mrs. Stewart is entitled to recover costs and attorneys' fees from Experian pursuant to 15 U.S.C. §§ 1681n and 1681o.

## COUNT III

### VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681s-2(b)
### Santander Consumer USA Inc.

227.    Plaintiff, Daywaren Stewart, incorporates by reference paragraphs 1 through 182 as though fully stated herein.

228.   Pursuant to 15 U.S.C. § 1681s-2(a), Santander is responsible for providing accurate information whenever it furnishes information to any consumer reporting agencies.

229.   Upon information and belief, Experian timely notified Santander of Mr. Stewart's dispute, and provided Santander with all the relevant information that Mr. Stewart had submitted.

230.   Pursuant to 15 U.S.C. § 1681s-2(b), Santander had a duty to investigate Mr. Stewart's dispute and accurately report its findings to Experian.

231.   A furnisher's investigation must be a good faith effort to ascertain the truth; a reasonable investigation must answer the substance of the consumer's dispute, and may not merely be a *pro forma* record review that simply begs the question.

232.   A reasonable investigation clearly requires some degree of careful inquiry, and more than just a superficial inquiry.

233.   The reasonableness of an investigation under the FCRA is generally a question of fact for the jury.

234.   In order to conduct a reasonable investigation, and pursuant to 15 U.S.C. § 1681s-2(b), Santander was required to review and consider all relevant information submitted by Mr. Stewart to Experian.

235.   Mr. Stewart's dispute was clear and unambiguous as to the inaccuracies of reporting the Debt as closed with $9,230 written off with no mention of Mr. Stewart's Bankruptcy case.

236.   Santander breached its duties as described herein.

237.   If Santander had conducted a reasonable investigation of Mr. Stewart's dispute, Santander would have reviewed and considered all of the information Mr. Stewart submitted to Experian in his dispute, and would have easily detected that what was being reported regarding the Debt was factually incorrect, inaccurate, and misleading.

238.   If Santander had conducted a reasonable investigation of Mr. Stewart's dispute, the tradeline on Mr. Stewart's consumer reports would have been corrected accordingly.

239.  Due to Santander's failures to provide accurate information, and failures to conduct reasonable investigations of Mr. Stewart's dispute, the false and

misleading information in Mr. Stewart's credit file and on Mr. Stewart's reports as described herein was not appropriately modified.

240.   Santander had all the information necessary to correct its reporting. Despite that, Santander failed to suitably correct its reporting, in the face of clear evidence that it was false and misleading. That failure indicates that Santander's investigation procedures were not reasonable.

241.   The fact that Santander had all the information necessary to correct its reporting, yet failed to appropriately do so, further indicates that Santander recklessly disregarded Mr. Stewart's dispute and the requirements of the FCRA, amounting to a willful violation of the statute.

242.   Santander willfully, or in the alternative negligently, violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation upon receiving notice of Mr. Stewart's dispute from Experian, by failing to appropriately modify the disputed information, and/or by failing to appropriately report the results of its investigation, in reckless disregard of the statutory requirements, Mr. Stewart's dispute, and the publicly recorded Bankruptcy Case filings.

243.   As a result of Santander's violations of 15 U.S.C. § 1681s-2(b), Mr. Stewart has suffered actual damages as stated herein. Mr. Stewart is, therefore,

entitled to recover actual damages from Santander under 15 U.S.C. §§ 1681n and 1681o.

244.   Santander's actions and omissions were willful, rendering Santander liable to Mr. Stewart for punitive damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

245.   Mr. Stewart is entitled to recover costs and attorneys' fees from Santander pursuant to 15 U.S.C. §§ 1681n and 1681o.

## COUNT IV

### VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681s-2(b)
### Santander Consumer USA Inc.

246.   Plaintiff, Kenya Stewart, incorporates by reference paragraphs 1 through 182 as though fully stated herein.

247.   Pursuant to 15 U.S.C. § 1681s-2(a), Santander is responsible for providing accurate information whenever it furnishes information to any consumer reporting agencies.

248.   Upon information and belief, Experian timely notified Santander of Mrs. Stewart's dispute, and provided Santander with all the relevant information that Mrs. Stewart had submitted.

249.   Pursuant to 15 U.S.C. § 1681s-2(b), Santander had a duty to investigate Mrs. Stewart's dispute and accurately report its findings to Experian.

250.   A furnisher's investigation must be a good faith effort to ascertain the truth; a reasonable investigation must answer the substance of the consumer's dispute, and may not merely be a *pro forma* record review that simply begs the question.

251.   A reasonable investigation clearly requires some degree of careful inquiry, and more than just a superficial inquiry.

252.   The reasonableness of an investigation under the FCRA is generally a question of fact for the jury.

253.   In order to conduct a reasonable investigation, and pursuant to 15 U.S.C. § 1681s-2(b), Santander was required to review and consider all relevant information submitted by Mrs. Stewart to Experian.

254.   Mrs. Stewart's dispute was clear and unambiguous as to the inaccuracies of reporting the Debt as closed with $9,230 written off with no mention of Mrs. Stewart's Bankruptcy case.

255.   Santander breached its duties as described herein.

256.   If Santander had conducted a reasonable investigation of Mrs. Stewart's dispute, Santander would have reviewed and considered all of the information Mrs. Stewart submitted to Experian in her dispute, and would have easily detected that what was being reported regarding the Debt was factually incorrect, inaccurate, and misleading.

257.   If Santander had conducted a reasonable investigation of Mrs. Stewart's dispute, the tradeline on Mrs. Stewart's consumer reports would have been corrected accordingly.

258.   Due to Santander's failures to provide accurate information, and failures to conduct reasonable investigations of Mrs. Stewart's dispute, the false and misleading information in Mrs. Stewart's credit file and on her reports as described herein was not appropriately modified.

259.   Santander had all the information necessary to correct its reporting. Despite that, Santander failed to suitably correct its reporting, in the face of clear evidence that it was false and misleading. That failure indicates that Santander's investigation procedures were not reasonable.

260.   The fact that Santander had all the information necessary to correct its reporting, yet failed to appropriately do so, further indicates that Santander

recklessly disregarded Mrs. Stewart's dispute and the requirements of the FCRA, amounting to a willful violation of the statute.

261.   Santander willfully, or in the alternative negligently, violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation upon receiving notice of Mrs. Stewart's dispute from Experian, by failing to appropriately modify the disputed information, and/or by failing to appropriately report the results of its investigation, in reckless disregard of the statutory requirements, Mrs. Stewart's dispute, and the publicly recorded Bankruptcy Case filings.

262.   As a result of Santander's violations of 15 U.S.C. § 1681s-2(b), Mrs. Stewart's has suffered actual damages as stated herein. Mrs. Stewart is, therefore, entitled to recover actual damages from Santander under 15 U.S.C. §§ 1681n and 1681o.

263.   Santander's actions and omissions were willful, rendering Santander liable to Mrs. Stewart for punitive damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

264.   Mrs. Stewart is entitled to recover costs and attorneys' fees from Santander pursuant to 15 U.S.C. §§ 1681n and 1681o.

## **TRIAL BY JURY**

265.   Plaintiffs are entitled to and hereby request a trial by jury.

**WHEREFORE**, Plaintiffs pray that judgment be entered in their favor and against Defendants, jointly and severally, for:

a)   Plaintiffs' actual damages;

b)   Statutory damages of $1,000 per violation of the FCRA pursuant to 15 U.S.C. § 1681n;

c)   Punitive damages pursuant to 15 U.S.C. § 1681n;

d)   Reasonable attorney's fees and costs pursuant to 15 U.S.C. §§ 1681n and/or 1681o; and

e)   Such other and further relief as may be just and proper.

Respectfully submitted this 28th day of August, 2020.

**BERRY AND ASSOCIATES**

*/s/ Joseph L. Erkenbrack*

Matthew T. Berry
Georgia Bar No. 055663
*matt@mattberry.com*

Joseph L. Erkenbrack
Georgia Bar No. 801728
jerkenbrack@mattberry.com

Berry & Associates
2751 Buford Highway, Suite 600
Atlanta, Georgia 30324

OFFICE    (678) 996-5172
FAX       (678) 996-5198

Counsel for Plaintiffs

66